USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   9/3/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA,                                         :
                                                                  :
                     -against-                                    :          23-CR-544 (VEC)
                                                                  :
                                                                  :          OPINION AND ORDER
DONTE GOULBOURNE and ARMANDO                                      :
KENNETH BENIQUEZ,                                                 :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        In the early hours of September 26, 2023, Donte Goulbourne was driving in the Bronx,

with Armando Beniquez in the passenger seat, when he approached a New York Police

Department ("NYPD") traffic safety checkpoint.  Compl., Dkt. 1 ¶ 9(b).  The police eventually

asked for consent to search the car, which Mr. Beniquez gave, and they found stolen checks in

the glove compartment.  *See id.* ¶ 9(c); Def. Exs. 7–8, Dkts. 62-7, 62-8 (footage from body-worn

cameras).  Based on that discovery, the police arrested Messrs. Goulbourne and Beniquez.  *See*

Compl. ¶ 9(e).  In post-arrest searches, the police found a check for $100,000 written to

Vanguard in Mr. Goulbourne's pocket and a stolen postal key in Mr. Beniquez's shoe.  *Id.*

        On October 24, 2023, Defendants Goulbourne and Beniquez were indicted for conspiracy

to possess a stolen postal key, to steal mail, and to possess stolen mail, as well as with theft of

mail and possession of stolen mail.  *See* Indictment, Dkt. 31.  Mr. Beniquez was individually

charged with possession of a stolen postal key.  *Id.*

        On May 10, 2024, Defendants moved to suppress the evidence seized as a result of the

stop.  *See* Def. Not. of Mot., Dkt. 61; Def. Mem., Dkt. 64.  The Court held oral argument on June

14, 2024.  For the following reasons, Defendants' motion to suppress is DENIED.

## FACTUAL FINDINGS[1]

In the early morning hours of September 26, 2023, Mr. Goulbourne was driving in the Morris Heights neighborhood of the Bronx with Mr. Beniquez in the front passenger seat and a third passenger, Hansel Hernandez,[2] in the rear passenger seat. Goulbourne Aff., Dkt. 62 ¶¶ 3, 7–8. At 4:24 A.M., the car approached an NYPD traffic safety checkpoint on Cedar Avenue in the Bronx. Elreda Cam.[3] at 4:24:54 A.M.; Def. Ex. 4, Dkt. 62-4 at 1 (form describing location of the checkpoint). Although seven officers staffed the checkpoint, Def. Ex. 4 at 1, Defendants had the most significant interactions with Officer Elreda and Sergeant Martinez. The Court primarily draws the facts from the footage from their body-worn cameras.

As Defendants' car pulled up to the checkpoint, Off. Elreda approached the driver side window and asked for Mr. Goulbourne's license, registration, and insurance. Elreda Cam. at 4:24:54 A.M. Almost immediately, Off. Elreda shone a light on the back window of the car and asked Mr. Goulbourne to lower the back window. *Id.* at 4:25:00 A.M. Mr. Goulbourne

---

[1]    The Court considered the evidence submitted by the parties, including Mr. Goulbourne's affirmation, *see* Dkt. 62, body-worn camera footage from four NYPD officers present during the traffic stop, *see* Dkts. 62-7, 62-8, 62-9, 62-10, and NYPD forms documenting the checkpoint, *see* Dkts. 62-1, 62-2, 62-3, 62-4, 62-11. The Court did not hold an evidentiary hearing because there are no facts in dispute. The entire traffic stop and all of Defendants' interactions with police were caught on video from multiple perspectives. The Government specifically requested that the Court decide the case without a hearing because "a hearing is not required to resolve the issue as the relevant events are not disputed and are captured on body-worn camera videos." Gov't Mem., Dkt. 70 at 23. The Defendants also asked the Court to decide the motion on the papers and requested an evidentiary hearing only "[i]n the alternative." Def. Mem. at 15.

[2]    Mr. Hernandez was arrested with Messrs. Goulbourne and Beniquez on September 26, 2023, but the complaint against him was dismissed without prejudice on October 5, 2023. *See* Order, *United States v. Hernandez*, 23-MJ-6550 (S.D.N.Y. Oct. 5, 2023), Dkt. 15.

[3]    References to the "Elreda Cam." are to the footage from the body-worn camera of Off. Hamze Elreda submitted as Defense Exhibit 7. References to the "Martinez Cam." are to the footage from the body-worn camera of Sgt. Juan Martinez submitted as Defense Exhibit 8. References to the "Ruguva Cam." are to the footage from the body-worn camera of Off. Valon Ruguva submitted as Defense Exhibit 9. Each reference to the body-worn camera footage includes a citation to the hour, minute, and second visible in the timestamp at the top right corner of the video.

complied.  *Id.*  Off. Elreda asked if the car belonged to Mr. Goulbourne; Mr. Goulbourne replied that it was a rental.  *Id.* at 4:25:15 A.M.

After about a minute and while Off. Elreda was inspecting the license and registration, Sgt. Martinez approached the vehicle.  Martinez Cam. at 4:25:53 A.M.  Sgt. Martinez said the stop was just a "quick" checkpoint to check license and registration and that the Defendants would be on their way soon.  *Id.*  For a few minutes, Sgt. Martinez asked the Defendants routine questions.  He asked the Defendants where they had been and learned they had gotten something to eat.  *Id.* at 4:26:01 A.M.  He asked whether they owned the car and learned that it was a rental car associated with Mr. Beniquez's uncle — according to Mr. Beniquez, his uncle rented cars on apps like Turo.  *Id.* at 4:26:34.  Sgt. Martinez asked how much he paid for the rental and responded that the reported cost — $100 per day — was expensive.  *Id.* at 4:27:11 A.M.  Sgt. Martinez asked for Mr. Goulbourne's license but then realized that Off. Elreda was already checking the license and running the license plate.[4]  *Id.* at 4:27:39 A.M.  Off. Elreda and Sgt. Martinez reviewed the license plate information and learned that the car was registered to an individual in New Jersey, not to a rental car company.  *Id.* at 4:27:46 A.M.; Elreda Cam. at 4:27:43 A.M.; Gov't Ex. 3, Dkt. 70-3.

Around the same time, Off. Elreda noticed that the VIN on the front dashboard was partially covered and asked Mr. Goulbourne about it.  Elreda Cam. at 4:28:07 A.M.  Mr. Goulbourne responded that a ticket from a parking lot was accidentally covering the VIN; whether accidentally or intentionally, Mr. Goulbourne then moved the ticket to cover more of the VIN.  *Id.* at 4:29:00 A.M.  The Government argues that the facts revealed in the first few minutes

---

[4]     Off. Elreda used his cell phone to check the license plate.  Elreda Cam. at 4:27:43 A.M.

of the stop gave Sgt. Martinez reasonable suspicion that criminal activity was afoot.  Gov't Mem., Dkt. 70 at 14; Gov't Supp. Letter, Dkt. 80 at 7.

Four minutes into the stop, at 4:29 A.M., Sgt. Martinez said he was going to test the tint of the windows; he told Mr. Goulbourne to step out of the car for the test.  Martinez Cam. at 4:29:20 A.M.  Sgt. Martinez tested the windows and orally confirmed that the tint was unlawful; the law requires that windows allow 70% of light to pass through, but the window on this car allowed only 19% of the light to pass through.  *Id.* at 4:29:57 A.M.  Sgt. Martinez told Mr. Goulbourne that this was a "very dark" tint and that they were going to write him a ticket.  *Id.* at 4:30:14 A.M.  Sg. Martinez further explained that, because the car was a rental, Mr. Goulbourne could go to court and tell the judge that he did not know about the illegal tint.  *Id.*  After explaining the same to Mr. Beniquez, Sgt. Martinez continued to review the license plate information that was on Off. Elreda's phone.  *Id.* at 4:30:54 A.M.

No one immediately started writing the summons for the window tint violation.  Instead, Sgt. Martinez stood near the rear of the car and asked Mr. Goulbourne questions, such as "where are you coming from," "where were you coming from before that," "where do you live," "where do these guys live," and "how do you know them?"  Martinez Cam. at 4:32:09 A.M.–4:32:38 A.M.  Mr. Goulbourne responded that they were getting something to eat; that they were home before that; that they all lived in the Bronx; and that the men in the car were his friends.  *Id.*  Sgt. Martinez returned to the front of the car and asked Mr. Beniquez similar questions; Mr. Beniquez said they were coming from Dyckman and, before that, they had been at his "pad."  *Id.* at 4:32:38 A.M.  Sgt. Martinez also asked more about the rental car and Mr. Beniquez's uncle.  *Id.* at 4:32:50 A.M.  Mr. Beniquez revealed that the person from whom he rented the car was not actually his uncle, but a family friend he calls uncle.  *Id.*

At 4:34 A.M., about five minutes after Sgt. Martinez had confirmed that the window tint was unlawful and about ten minutes into the stop, Sgt. Martinez realized that none of the officers had started writing the summons.  *Id.* at 4:34:02.  Off. Elreda offered to do so and went to his patrol car to do so.  Elreda Cam. at 4:34:05 A.M.  The summons was a short, one-page form; it took Off. Elreda ten minutes to complete.  *Id.* at 4:34:32 A.M.–4:44:20 A.M.  Around 4:45 A.M., Off. Elreda returned to Mr. Goulbourne's car with the summons.[5]  *Id.* at 4:45:10 A.M.

While Off. Elreda was writing the summons, Sgt. Martinez asked the men more questions.  He asked Mr. Goulbourne whether there was anything illegal in the car and listed several possibilities.[6]  Martinez Cam. at 4:35:06 A.M.  Mr. Goulbourne quickly answered "no" to each item.  *Id.*  Sgt. Martinez asked more questions about the two passengers.  *Id.* at 4:35:30 A.M.  When Sgt. Martinez asked for the passengers' names, Mr. Goulbourne said he thought the front passenger's name was Kenny, and he did not know the name of the other passenger.  *Id.*  Sgt. Martinez then went to the front of the car to talk to Mr. Beniquez; Mr. Beniquez reported that his name is Kenneth and confirmed that Mr. Goulborne only met the other passenger that night.  *Id.* at 4:35:55 A.M.  Mr. Beniquez and the other passenger, Mr. Hernandez, stated that they had nothing illegal in the car.  *Id.* at 4:37:33 A.M.–4:37:45 A.M.

Sgt. Martinez then asked Mr. Beniquez and Mr. Hernandez to exit the car and stand by the rear of the car with Mr. Goulbourne.  *Id.* at 4:37:53 A.M.  They complied.  *Id.*  Sgt. Martinez and five other officers (six in total) all stood around the car and the three men.  *Id.* at 4:38:20 A.M.  For a few minutes, Sgt. Martinez and the officers shone their flashlights into the open

---

[5]    Mr. Goulbourne never actually received a copy of the summons because, as Off. Elreda approached with it, Sgt. Martinez asked for consent to search the car.  That search ultimately led to Mr. Goulbourne's arrest.  *See* Martinez Cam. at 4:45:23 A.M.; *see also* Goulbourne Aff. ¶ 10.

[6]    Sgt. Martinez mentioned large amounts of marijuana, cocaine, heroin, firearms, and other weapons. Martinez Cam. at 4:35:06 A.M.

windows of the now-empty car, *id.* at 4:38:35 A.M., talked to Defendants about the importance

of fixing the illegal window tint and the covered VIN,[7] *id.* at 4:39:25 A.M., and waited for Off.

Elreda to return with the summons, *id.* at 4:39:16 A.M. (stating that the officer with the summons

was coming over soon).  Sgt. Martinez asked Mr. Goulbourne how long he had rented the car;

Mr. Beniquez responded that he had the car for three weeks.  *Id.* at 4:43:25 A.M.  Sgt. Martinez,

apparently only then realizing that Mr. Goulbourne, the driver of the car, was not the renter,

asked Mr. Beniquez, "So you rent the car and he drives?  What kind of partnership is this?"  *Id.*

at 4:43:38 A.M.  Sgt. Martinez followed up with more questions about why Mr. Beniquez was

not driving his own rental and where the men had been earlier in the day.  *Id.* at 4:44:40 A.M.  At

about that time, Off. Elreda returned with the summons.  Elreda Cam. at 4:45:10 A.M.

At 4:45 A.M., fifteen minutes after Sgt. Martinez had confirmed that the window tint was

unlawful and about twenty minutes into the stop, Sgt. Martinez asked Mr. Beniquez for consent

to search the car.  Martinez Cam. at 4:45:23 A.M.  Mr. Beniquez first said he wanted to leave

with the summons, but then he consented to the search.  *Id.* at 4:45:34 A.M.  Sgt. Martinez and

Off. Elreda both began searching the front of the car.[8]  *Id.* at 4:46:05 A.M.; Elreda Cam. at

4:46:05 A.M.  During the search, Off. Elreda pulled on the handle of the glove compartment; it

was locked.  Elreda Cam. at 4:48:55 A.M.  He searched around for the key, which he found in

the center console of the car.  *Id.* at 4:49:11 A.M.  He used the key to open the glove

---

[7]        Off. Ruguva explained his concern about the obstructed VIN to Mr. Beniquez by saying the VIN was the "fingerprint to the car"; he also said that it "looks suspicious" that the VIN was partly covered.  Ruguva Cam. at 4:39:57 A.M.

[8]        After Sgt. Martinez had permission to search the car and had opened the front door, he turned back and asked Defendants if they had any "lean in the car," to which Mr. Beniquez responded, "No, I drank it."  Martinez Cam. at 4:45:56 A.M.  Because the discussion about lean came after Sgt. Martinez had asked for and received consent to search, the Court does not consider this fact in determining whether the police had reasonable suspicion before asking for consent to search the car.

compartment and found 71 checks, none of which listed Defendants as the payee or payor, totaling more than $437,000. *Id.* at 4:49:30 A.M.; Compl. ¶ 9(c). The police then arrested the Defendants. Martinez Cam. at 4:54:10 A.M. In a post-arrest search, the police found a check for $100,000 with Vanguard as the payee in Mr. Goulbourne's pocket and a postal key in Mr. Beniquez's shoe. Compl. ¶ 9(e). In a post-seizure inventory search of the car, police found a bag in the trunk that had 137 pieces of mail that lacked the cancellations and processing markings typically applied by the United States Postal Service to outgoing mail. *Id.* ¶ 9(c).

Months later, Sgt. Martinez filed a "Vehicle Checkpoint Form," which included the date, time, and location of the checkpoint at which Defendants were stopped. Def. Ex. 4 at 1. The form had a space to list the "reason(s) for checkpoint" and instructed officers to indicate the nature of the condition, the factors evidencing existence of condition, and how and why a vehicle checkpoint and the specific location chosen will remedy/deter the condition in a productive manner. *Id.* Sgt. Martinez wrote only "safety check point" with three patrol cars. *Id.*

Defendants moved to suppress the evidence seized arguing that the checkpoint was unlawful and arguing that, even if the checkpoint were legal, the police unlawfully prolonged the stop.[9] *See* Mot., Dkt. 61. The Government opposed the motion. *See* Gov't Mem., Dkt. 70. The Court held oral argument on June 14, 2024, and allowed the parties to file supplemental briefing regarding whether the window tint violation was an alternative basis to justify the stop and whether, assuming the stop ripened into a *Terry* stop, the police acted diligently to confirm or dispel their suspicion of criminal activity. Order, Dkt. 74. The parties filed their supplemental letters and responses on June 28 and July 19, 2024. *See* Dkts., 79–80, 83–84.

---

[9]    Defendant Goulbourne filed the motion to suppress, and Defendant Beniquez filed a letter motion requesting to join the motion. *See* Letter Mot., Dkt. 63. Defendant Beniquez filed the reply memorandum in support, *see* Reply, Dkt. 71, and Defendant Goulbourne filed a letter motion to join his reply. *See* Letter Mot., Dkt. 72. The Defendants' letter motions to join each other's memoranda are GRANTED.

## DISCUSSION

### I.    Legal Standard for the Motion to Suppress

"The Fourth Amendment to the Constitution provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting U.S. Const. amend. IV). The "ultimate touchstone" of the Fourth Amendment is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted). To determine whether a search is reasonable, courts "examine the totality of the circumstances" and "balance, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *In re Terrorist Bombings*, 552 F.3d 157, 172 (2d Cir. 2008) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)). A search for evidence of criminal wrongdoing "generally requires" law enforcement to obtain a search warrant, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995), but "neither a warrant nor probable cause . . . is an indispensable component of reasonableness in every circumstance," *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).

On a suppression motion, the defendant has the initial burden of establishing a basis for his motion, and, if he does so, then the burden shifts to the Government to demonstrate, by a preponderance of the evidence, that the police acted lawfully. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

### A.    Fourth Amendment as Applied to Traffic Stops

Detention during a traffic stop, even if only for a brief period and for a limited purpose, is a "seizure" of "persons" within the meaning of the Fourth Amendment. *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017). A traffic violation or safety checkpoint can justify "seizure" of a

vehicle and the people inside it without a warrant. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (traffic violation justifies stop); *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (safety checkpoint justifies stop). Although no warrant is required, such a traffic stop must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (citation omitted). The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission,'" including to address the traffic violation that warranted the stop or to attend to related safety concerns. *See Rodriguez*, 575 U.S. at 354. A seizure "justified solely by the interest in issuing a . . . ticket to the driver" — that is, a stop without reasonable suspicion of criminal activity beyond the traffic violation — "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). An "[o]n-scene investigation into other crimes . . . detours" from the appropriate mission. *Rodriguez*, 575 U.S. at 356.

That said, the police may extend a stop beyond its initial mission if, during the stop, they develop reasonable suspicion of other criminal activity. *See United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) ("A traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts."). If the circumstances create a "reasonable basis to think that the person to be detained is committing or has committed a criminal offense," then the search and seizure becomes more akin to a *Terry* stop. *See United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quotation omitted). For *Terry*-like investigative stops, officers may detain a suspect and conduct a search to confirm their suspicions. *Id.* Still, "the Fourth Amendment demands that the scope and duration of the detention be reasonable." *Id.* at 336. Police officers must "diligently pursue[] a

means of investigation that [is] likely to confirm or dispel their suspicions quickly, during which time it [is] necessary to detain the defendant." *Sharpe*, 470 U.S. at 686.  If police officers are not diligent and the stop becomes "too long or intrusive to be justified as an investigative stop," then they have exceeded their authority and violate the defendant's Fourth Amendment rights. *Bailey*, 743 F.3d at 336.

## II.    Defendants' Motion to Suppress Evidence Seized During the Traffic Stop is Denied

Defendants argue that the evidence obtained from the car should be suppressed because the police had no valid justification for the traffic stop at its inception, *see* Def. Mem. at 9; Def. Supp. Letter, Dkt. 79, and that, even if the stop were justified by the checkpoint at inception, the police unreasonably prolonged the stop beyond their authority to do so, Def. Mem. at 11; Def. Supp. Response, Dkt. 83.  The Government asserts that the stop was lawful either because of the traffic safety checkpoint or because of the window tint violation, and that the police acted diligently and without undue delay.  Gov't Mem. at 7–14.  The Court concludes that, although the Government has not adequately defended the legality of the checkpoint, the stop was lawful at inception and the police acted diligently to confirm or dispel their reasonable suspicion of criminal activity.

### A.  The Stop Was Justified at Inception

The Government provides two possible justifications for the stop.  First, it argues the stop was lawful as a traffic safety checkpoint.  Gov't Mem. at 8–9.  Second, it argues that, even if the safety checkpoint was unlawful, the police had a reasonable alternative basis for the stop: the car's tinted window violation.  *Id.* at 11; Gov't Supp. Response at 4–5.

A traffic checkpoint is reasonable under the Fourth Amendment only if (1) the State's interest in operating the checkpoint and (2) the effectiveness of the checkpoint in advancing that

interest (3) outweigh the intrusion inflicted upon motorists by the operation of the checkpoint. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 448–49 (1990); *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000). The police must have an interest in operating the checkpoint, beyond "detect[ing] evidence of ordinary criminal wrongdoing," and the Government must show that the checkpoint was "designed primarily to serve purposes closely related to the problems of . . . ensuring roadway safety." *Edmond*, 531 U.S. at 41. There must be evidence that, "at the time of the implementation, the checkpoints were reasonably viewed as an effective mechanism" for achieving the stated interest. *Maxwell v. City of New York*, 102 F.3d 664, 667 (2d Cir. 1996).

For this checkpoint, the Court has almost no information about what specific safety concerns the police wanted to address or why they picked this particular location to address their safety concerns. There is no evidence from "the time of the implementation" of the checkpoint. *Id.* The only evidence in the record is the form Sgt. Martinez submitted months after the night of the checkpoint. Def. Ex. 4. The form states only that it was a "safety checkpoint" with three patrol cars. *Id.* at 1. During oral argument, the Government represented that the checkpoint was on a street adjacent to the Major Deegan Expressway located between two Expressway entrances that was frequented by vehicles, even at 4:00 A.M. *See* Argument Tr., Dkt. 75 at 48:4–24. In the Government's view, that information alone is sufficient to demonstrate the checkpoint's "safety purpose." *Id.* The Court disagrees and concludes that the Defendants have cleared their initial burden of establishing that the checkpoint was unlawful. The Government has simply not provided sufficient evidence to demonstrate what interest the police were attempting to advance by operating the checkpoint or that a checkpoint at that time and place was an effective mechanism for advancing that interest.

Because there is insufficient evidence to justify the checkpoint's validity, the Court considers the proposed alternative basis for the stop.  To determine whether a traffic violation is a proper alternative basis for a stop, courts must assess whether there was "probable cause" to believe that a traffic violation occurred from "the standpoint of an *objectively* reasonable police officer" based on historical facts.  *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  The officer need not have actually observed the violation before the stop; all the law requires is that an objectively reasonable officer "might have suspected the windows were [unlawfully] tinted."  *United States v. Morgan*, No. 17-CR-354 (KBF), 2017 WL 4621632, at *5 (S.D.N.Y. Oct. 12, 2017); *see also Harrell*, 268 F.3d at 148 (noting that the officer "vacillated on the issue" of whether he observed the violation before the stop).

Here, the Court concludes that an objectively reasonable officer would have suspected that the windows were unlawfully tinted.  The footage from the body-worn cameras reveals that the area was well lit by streetlights.  *See, e.g.*, Elreda Cam. at 4:24:48 (showing area lit by streetlights as Defendants' car approached the checkpoint).  Immediately as Off. Elreda approached the car, he shone a light on the back passenger window and, apparently because he could not see through it, asked Mr. Goulbourne to lower the window.  *Id.* at 4:25:00 A.M. During this interaction, it is clear, even to a non-law enforcement observer, that the windows are too dark.  *Id.*  Sgt. Martinez also quickly noticed the unlawful tint.  He decided to test the window less than four minutes after he approached the car and immediately after asking routine questions and checking Mr. Goulbourne's license.  Martinez Cam. at 4:29:20 A.M.  The test confirmed what was immediately obvious: the tint was well above the legal limit — letting in only 19% of light instead of the required 70%.  *Id.* at 4:29:57 A.M.  Sgt. Martinez said the

window was "very dark." *Id.* at 4:30:14 A.M.  Based on the Court's own review of the windows

in the footage from the body-worn cameras, the fact that both Off. Elreda and Sgt. Martinez

quickly noticed the tints, and that the tints were significantly darker than the legal limit, the

Court concludes that an objectively reasonable officer would have suspected the traffic violation

even if there had not been a traffic safety checkpoint.

      The window tint violation gave the police authority to stop the car and write a summons

for that particular violation.  It did not, however, grant them authority to deviate from the

purpose of the stop.  *See Gomez*, 877 F.3d at 91 (holding that, during stop lasting only five

minutes, questions about drugs were an unconstitutional "detour" from investigating and

ticketing traffic violations).  The police here deviated from the purpose of the stop.  After

determining that the windows were tinted, the police did not immediately begin to write the

summons.  For a few minutes after confirming the windows were too dark, Sgt. Martinez asked

questions about the passengers' itinerary, their residence, their relationship, and from whom they

rented the car.  *See* Martinez Cam. at 4:29:57 A.M.–4:34:02 A.M.  That detour to ask questions

unrelated to the window tint violation was not justified by the window tint violation alone.  The

prolonged stop was permissible, then, only if the police otherwise had reasonable suspicion to

extend the stop.

### B.  The Police Had Reasonable Suspicion to Extend the Stop

      The police had authority to prolong the stop beyond dealing with the traffic violation only

if they had reasonable suspicion that other criminal activity was afoot.  For there to be reasonable

suspicion, the likelihood of criminal activity need not rise to the level required for probable

cause, but there must be more than a "hunch."  *Bailey*, 743 F.3d at 332 (citing *Terry v. Ohio*, 392

U.S. 1, 27 (1968)).  Reasonable suspicion requires "specific and articulable facts which, taken

together with rational inferences from those facts," provide detaining officers with a

"particularized and objective basis for suspecting wrongdoing." *Id.* (citations omitted). Courts look at the "totality of the circumstances" to determine whether the detaining officer had reasonable suspicion; under the circumstances, officers may draw on their "experience and specialized training to make inferences . . . and deductions." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The Government argues that the police developed reasonable suspicion of criminal activity — including that the car was stolen — in the first few minutes of the stop. *See* Gov't Supp. Letter at 7. The Court agrees. Such suspicion was reasonable given the facts that: (1) the car was being driven at a very early hour — approximately 4:20 A.M.; (2) the occupants said they were coming from getting food to eat, despite the hour; (3) the car was purportedly rented; (4) the renter stated that he rented the car from his uncle but then later stated that he had rented the car from a friend; (5) the car was registered to an individual at a New Jersey address, not to a rental car company; and (6) the VIN was partially covered.[10] *See, e.g.*, *United States v. Wallace*, 937 F.3d 130, 139 (2d Cir. 2019) (holding that a blocked VIN contributed to reasonable suspicion); *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (holding that being out at an early hour and having out-of-state license plates, along with other factors, created reasonable suspicion that criminal activity was afoot). The Court acknowledges that Defendants appeared calm and complied with all officer instructions. Nevertheless, given the totality of the circumstances, there were enough other facts to give a reasonable officer a particularized and objective basis for suspected wrongdoing, including that the car might be stolen.

The suspicion grew as the stop continued and the police gathered more information. For example, Mr. Goulbourne first said that the passengers in the car were his friends. Martinez

---

[10]      Another officer on the scene, Off. Ruguva, contemporaneously told Mr. Beniquez that it "look[ed] suspicious" that the VIN was covered. Ruguva Cam. at 4:39:57 A.M.

Cam. at 4:32:28 A.M.  Later, he said that he "think[s]" the front passenger's name is Kenny and that he did not know the other passenger's name.  *Id.* at 4:35:30 A.M.  To say the least, it is objectively suspicious to be driving at 4:20 A.M. with "friends" whose names you do not know.  Separately, the police initially understood that Mr. Goulbourne, the driver, had rented the car from Mr. Beniquez's uncle, *see* Martinez Cam. at 4:26:34 A.M. (Mr. Goulbourne stating that the car is a rental), but they later learned that, in fact, Mr. Beniquez was the purported renter, even though he was not the driver, *id.* at 4:43:28 A.M. ("Oh, you're renting it? . . . So you rent the car and he drives?  What kind of partnership is this?").  These, and other confusing answers shown on the footage from the body-worn cameras, provided a basis for the police to prolong the stop to investigate their suspicions.

### C.  The Police Acted Diligently to Confirm or Dispel Their Reasonable Suspicion

The stop lasted twenty minutes before Sgt. Martinez asked for consent to search the car.  The Court must examine whether, during that time, "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."  *Sharpe*, 470 U.S. at 686.

### 1.  Legal Standard

There is no "hard-and-fast time limit" or "*per se* rule" for the permissible duration of an investigative stop.  *Sharpe*, 470 U.S. at 686.  Instead, courts must assess the police officers' conduct during the stop and whether that conduct was reasonable to confirm or dispel their suspicion.  *Id.*  Courts must "not indulge in unrealistic second-guessing."  *Id.* at 686–87 ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."). The question is not whether the stop "might, in the abstract, have been accomplished by less intrusive

means," but whether "the police acted unreasonably in failing to recognize it or to pursue it."
*Bailey*, 743 F.3d at 340 (quotation omitted).

Delays — ranging from minutes to hours long — are not unreasonable if they are caused
by law enforcement officers taking necessary steps to confirm or dispel suspicion. In *Sharpe*, a
twenty-minute detention was held to be reasonable when a federal agent left suspects with local
police while he pursued the suspected accomplice's truck. 470 U.S. at 687. After reaching the
accomplice's truck, the agent "proceeded expeditiously"; "within the space of a few minutes" he
checked the driver's license, reviewed the truck's bill of sale, sought but was denied permission
to search the truck, confirmed his suspicion that the truck was probably overloaded by stepping
on the rear bumper, and detected the smell of marijuana. *Id.* The prolonged detention of the
suspects while the agent pursued the truck was necessary to determine whether his suspicion,
that the stopped car and the accomplice truck were both involved in drug trafficking, was correct.
*Id.* at 687–88 ("Clearly this case does not involve any delay unnecessary to the legitimate
investigation of the law enforcement officers.").

In many different scenarios, courts have approved prolonged stops during which the
officers used the time productively. *See Bailey*, 743 F.3d at 336 (time spent "awaiting the results
of a court-authorized search of the location from which [the suspect] was just seen to depart" was
not undue delay); *United States v. McCargo*, 464 F.3d 192, 198–99 (2d Cir. 2006) (time spent
transporting suspect to crime scene for possible identification was not undue delay); *United
States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) (a twenty-minute wait for drug-sniffing
canine to confirm or dispel reasonable suspicion that the defendant was trafficking narcotics was
not undue delay); *United States v. Nunez*, No. 17-CR-008 (KBF), 2017 WL 2438802, at *4
(S.D.N.Y. June 6, 2017) (same); *United States v. Esieke*, 940 F.2d 29, 35 (2d Cir. 1991) (time

spent waiting for someone suspected of swallowing drug-filled balloons to have a bowel movement is not undue delay).  On the other hand, an officer unnecessarily prolonged a stop by "ask[ing] unrelated questions and conduct[ing] a K-9 sniff" of a car without having reasonable suspicion that the driver of the car was trafficking drugs.  *United States v. Cornejo*, 196 F. Supp. 3d 1137, 1156 (E.D. Cal. 2016).

In a strikingly similar example, an officer prolonged a stop because she believed the driver's rental car might be stolen (based on an expired rental agreement) and asked the dispatch officer to call the rental car company.  *See Foreste*, 780 F.3d at 520.  There, the officer "suspected that criminal activity (auto theft) might be afoot, and took a reasonable amount of time, a total of only twenty-two minutes, to dispel that suspicion."  *Id.* at 526.

### 2.  Application

The police took necessary steps to confirm or dispel their suspicions up to and including the request to search the car.  In the twenty minutes between the car arriving at the checkpoint and Mr. Beniquez consenting to the search, the police: (1) asked for and received Mr. Goulbourne's license and registration; (2) asked Mr. Goulbourne to remove the paper covering the VIN and explained the importance of not obstructing the VIN; (3) ran the car's license plate and reviewed the results; (4) tested the window tint and wrote a summons for the violation; (5) asked many questions about the rental car including from whom the car was rented, whether it was rented through a company or an app, the cost of the rental, how long the renter had been renting the car, and why Mr. Goulbourne was driving if Mr. Beniquez was the renter; (6) asked other routine questions including from where the Defendants were coming, how they knew each other, and where they lived; (7) asked whether the Defendants had anything illegal, such as drugs or firearms, in the car; and (8) conducted a visual inspection of the interior of the car by shining flashlights into the open windows.

During oral argument, the Court noted a "pretty substantial delay when [the officers] seem to be futzing around." Argument Tr. at 74:24–75:1. Since making that statement, the Court has received supplemental briefing on whether the officers acted diligently and re-watched the entire twenty-minute interaction from four perspectives. After a closer look, the Court can detect only a couple periods of thirty seconds or a minute when the police were standing guard around the car and the Defendants without actively taking investigatory steps. For nearly the entire interaction, Sgt. Martinez was asking questions, visually inspecting the car, and reviewing the information obtained about the car based on its license plate before he asked for consent to search the car. Given the overall diligence of the police and the fact that there was reasonable suspicion of criminal activity, it would be "unrealistic second-guessing," *Sharpe*, 470 U.S. at 686, to conclude that the police unlawfully prolonged the stop by taking a thirty second break from active investigation.

In short, the twenty-minute period, during which time the police worked to confirm or dispel their suspicions, did not violate the Defendants' Fourth Amendment rights.

### D. The Search of the Glove Compartment was Lawful

Finally, Defendants challenge the search of the glove compartment. Def. Mem. at 13. They argue that Mr. Beniquez's consent to search the car did not extend to the locked glove compartment. *Id.* at 13–14. After the arrests, Mr. Beniquez realized that the police had opened the glove compartment and protested that the glove compartment was closed and locked. Martinez Cam. at 4:54:21 A.M. Mr. Beniquez stated, "I didn't consent to that." *Id.* at 4:54:38. The initial consent, however, was not qualified. *See id.* at 4:45:43 A.M. (When asked if Sgt. Martinez could search the car, Mr. Beniquez said, "If you want to, then yeah, go ahead.").

Where the parameters of the consent are not clearly articulated, "an individual who consents to a search of his car should reasonably expect that readily-opened, closed containers

18

discovered inside the car will be opened and examined." *United States v. Snow*, 44 F.3d 133,

135 (2d Cir. 1995). In *Snow*, the Second Circuit held that consent to search a car extended to a

closed duffel bag in the passenger compartment; the panel distinguished "readily-opened"

containers from those that are "locked or otherwise secured," about which the court expressed no

view. *Id.* Applying the principle that consent extends to readily opened containers, many other

circuits have held that consent to search includes locked containers where police have the key or

can otherwise open the container without causing damage. *See, e.g.*, *United States v. Pikyavit*,

527 F.3d 1126, 1131 (10th Cir. 2008) (holding that consent to search included opening locked

doors if entry could be made without causing property damage); *United States v. Jones*, 356 F.3d

529, 534 (4th Cir. 2004) ("[E]xpress consent to search the duffle bag extended to the

locked metal box [located inside of the bag]."); *United States v. Torres*, 32 F.3d 225, 232 (7th

Cir. 1994) (holding that police who have obtained a broad consent to search "may open locked

containers, provided that . . . the opening of the container does not involve the unnecessary

infliction of damage"); *United States v. Martinez*, 949 F.2d 1117, 1120 (11th Cir. 1992)

("[G]eneral consent to search a specific area for specific things includes consent to open

locked containers that may contain the objects of the search.").

District courts within the Second Circuit have applied the same rule: consent to search an

area extends to containers in that area that are readily opened with a nearby key or tool without

causing damage. *See, e.g.*, *Cartagena v. United States*, No. 10-CR-222 (RWS), 2015 WL

5669564, at *8 (S.D.N.Y. Sept. 25, 2015) ("[The defendant]'s assertion that the officers

exceeded the scope of his consent because [one of the officer's] used a screwdriver to open the

storage bin is without merit. Courts have routinely permitted officers to search for and open

hidden compartments that do not cause structural damage to property."); *United States v.*

*Maragni*, No. 91-CR-1220, 1995 WL 264107, at *1 (E.D.N.Y. Apr. 27, 1995) (finding that consent to "conduct a complete search of [the] premises . . . was sufficiently broad to permit the opening of the locked container"). *But see People v. McFarlane*, 93 A.D.3d 467, 467–68 (1st Dep't 2012), *aff'd*, 21 N.Y.3d 1034 (2013) (consent did not extend to locked glove compartment).

In this case, Mr. Beniquez's consent to search the car extended to the glove compartment because it was readily opened by a nearby key without force or damage. If Mr. Beniquez had wanted to limit the scope of his search, he could have done so at the outset; instead, he told Sgt. Martinez to "go ahead" and imposed no restrictions. Martinez Cam. at 4:45:43 A.M.

Even if the consent did not extend to the glove compartment, the evidence would not be suppressed because the police would have inevitably discovered it. *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (explaining that fruits of an illegal search or seizure are admissible at trial if the government can prove that "the evidence would have been obtained inevitably without the constitutional violation"). Based on the consent to search the car, the police would have eventually made their way to the trunk and found the bag containing 137 pieces of unopened mail. Compl. ¶ 9(c); *United States v. Jones*, 154 F. Supp. 2d 617, 622 (S.D.N.Y. 2001) (applying inevitable discovery doctrine where it would be "inconceivable" that the officers, after receiving consent, would have failed to find the evidence). The discovery of the mail in the trunk would have prompted Defendants' arrest, followed by a search of their persons and an inventory of the car. The inevitable search of their persons would have revealed the $100,000 check addressed to Vanguard in Mr. Goulbourne's pocket and the postal key in Mr. Beniquez's shoe. *Id.* ¶ 9(e). The inventory search of the car would have resulted in the checks in the glove compartment being found and seized. *See, e.g.*, *United States v. Cancel*, 167 F. Supp.

3d 584, 597 (S.D.N.Y. 2016) (applying inevitable discovery doctrine to evidence that would have been discovered during inventory search of a car).  Overall, the police had consent to search the entire car, including the glove compartment, and they would, inevitably, have discovered the checks in the glove compartment even if they had not unlocked it during the initial consent search.

## CONCLUSION

For the foregoing reasons, Defendants' motion to suppress is DENIED.  The Clerk of Court is respectfully directed to close the open motions at Docket Entries 61, 63, and 72.

The parties must meet and confer on mutually agreeable trial dates in October or November 2024.  Not later than **Tuesday, September 17, 2024**, the parties must submit a joint letter with three mutually acceptable dates for trial.


**SO ORDERED.**

Date:  September 3, 2024            **VALERIE CAPRONI**
New York, NY                **United States District Judge**